**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**WON BUY LAND, LLC,**

      **Plaintiff,**

**vs.**                                                           **CASE NO.:**

**MIDWEST ASSETS AND OPERATIONS, LLC
A Georgia Limited Liability Company,
d/b/a ONE WATER YACHT GROUP**

**and**

**RIVIERA MARINE, (INT.) PTY. LTD., INC.,
An Australian Corporation,
d/b/a YACHTS OF AMERICAS,**

      **Defendants.**

_____/

## DEFENDANT, RIVIERA MARINE, (INT.) PTY. LTD., INC.'S NOTICE OF REMOVAL

      Defendant, RIVIERA MARINE, (INT.) PTY. LTD., INC., pursuant to 28 U.S.C. §1332, 1441 and 1446, and 15 U.S.C. §2310 has filed a Notice of Removal of this action to the United States District Court for the Southern District of Florida, West Palm Beach Division. In support of the removal of this action, DEFENDANT, RIVIERA MARINE, (INT.) PTY. LTD., INC. ("Riviera"), states as follows:

1.      Plaintiff, Won Buy Land, LLC, ("Plaintiff" or "Won Buy Land, LLC"), filed a civil action against Riviera Marine, (Int.) Pty. Ltd., Inc., in Palm Beach County Case No. 2022 CA 8601 for alleged revocation of acceptance, and breach of express and implied warranties under the UCC and the Magnuson Moss Warranty Act.

2.      Defendant, Riviera Marine, (INT.) PTY. LTD., INC., removes this action on the basis of diversity jurisdiction pursuant to 28 U.S.C. §1332, 1441 and 1446, and on the basis of Federal Question jurisdiction under  15 U.S.C. §2310.

3.      This civil action is between citizens of different states and the amount of controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

4.      Plaintiff and each Defendant are diverse in citizenship.

5.      Plaintiff is a Florida Limited Liability Company with a principle business office address in Boca Raton, Florida.

6.      Riviera is an Australian Corporation with a principle business office in Australia.

7.      Accordingly, for the purpose of determining whether diversity jurisdiction exists, Defendant is a citizen of Australia.

8.      Midwest Assets and Operations, LLC is a Delaware limited liability company.   On information and belief, its principal place is located in the state of Georgia.

9.      The Complaint alleges damages in excess of $5,097,968.68.  Incidental and consequential damages alone are alleged to be $78,423.68.

10.      Accordingly, the $75,000.00 jurisdictional limit applicable to diversity actions, and the $50,000.00 threshold applicable to Magnusson Moss actions has each been exceeded.

11.      The United States District Court for the Southern District of Florida, West Palm Beach Division, encompasses the location of the State Court Action. Thus Defendant may properly remove the State Court action to this Court pursuant to 28 U.S.C. §1441(a).

12.      Copy of all process, pleadings, and Orders are filed concurrently with this Notice of Removal as required by 28 U.S.C. §1441(a). (See Exhibit A).

13.      Pursuant to 28 U.S.C. §1441(b), the Defendant has served written notice on the Plaintiff of this Notice of Removal. The Defendant filed and served a true and correct copy of the Notice of Filing Notice of Removal with the State Court as required by 28 U.S.C. §1446(d).  (See Exhibit B).

14.      Defendant has submitted herewith a filing fee.

WHEREFORE, Defendant, RIVIERA MARINE, (INT.) PTY. LTD., INC., respectfully requests that this Court accept the removal of this action from State Court.

Respectfully Submitted on this 3rd day of October, 2022.

**BERLIN | PATTEN | EBLING, PLLC**
3700 South Tamiami Trail, Suite 200
Sarasota, Florida 34239
Telephone: (941) 954-9991; Facsimile: (941) 954-9992
Primary E-Mail:  dguarnieri@berlinpatten.com
Secondary E-mail:  marinal@berlinpatten.com

By: s/*Daniel C. Guarnieri*
Daniel C. Guarnieri, Esq.
Florida Bar No. 0914401

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on this 3rd day of October, 2022, I electronically filed the foregoing document with the United States District Court for the Southern District of Florida by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: s/*Daniel C. Guarnieri*
Daniel C. Guarnieri, Esq.
Florida Bar No. 0914401

<u>Service List:</u>
Haas Hatic
Greenspoon Marder LLP
200 East Broward Blvd. Ste. 1800
Ft. Lauderdale, FL 33301
Email: haas.hatic@gmlaw.com

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH
COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

Case No.

WON BUY LAND, LLC a
Florida limited liability company,

     Plaintiff,

v.

MIDWEST ASSETS &
OPERATIONS, LLC a Georgia
Limited liability company d/b/a
ONEWATER YACHT GROUP,

and

RIVIERA MARINE (INT.) PTY. LTD.,
INC. an Australian corporation
d/b/a YACHTS OF THE
AMERICAS,

     Defendants.

_____/

NOT A CERTIFIED COPY

## **COMPLAINT**

Plaintiff, WON BUY LAND, LLC sues Defendant, MIDWEST ASSETS &
OPERATIONS, LLC a Georgia Limited liability company d/b/a ONEWATER YACHT GROUP
and Defendant, RIVIERA MARINE (INT.) PTY. LTD., INC. a Australian corporation d/b/a
RIVIERA YACHTS OF THE AMERICAS on three separate legal claims:

    (1) Revocation of Acceptance,

    (2) Breach of Express Warranty, and

51535684v1 05726.0009

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 09/02/2022 05:01:51 PM

(3) Breach of the Florida Uniform Commercial Code and Magnuson Moss Warranty Act

Implied Warranty of Merchantability, and states in support:

## JURISDICTION AND VENUE

1.      This is an action for damages over Thirty-Thousand Dollars ($30,000.00) and

within the jurisdiction of this Court.

2.      Venue is appropriate in this Court inasmuch as all activities and conduct giving rise

to the action occurred in Palm Beach County, Florida.

## PARTIES

3.      Won Buy Land, LLC ("WBL") is a Florida limited liability company, which has

and continues to do business in Palm Beach County, Florida.

4.      Defendant MIDWEST ASSETS & OPERATIONS, LLC d/b/a ONEWATER

YACHT GROUP ("OWYG") is a foreign limited liability company, which has and continues to

do business in Palm Beach County, Florida.

5.      OWYG's Registered Agent for service of process is Jack Ezzell, 65th S. Federal

Highway, Pompano Beach, Florida 33062.

6.      Defendant RIVIERA MARINE (INT.) PTY. LTD., INC. d/b/a RIVIERA

YACHTS OF THE AMERICAS ("RIVIERA") is an Australian corporation, which has and

continues to do business in Palm Beach County, Florida.

7.      RIVIERA's most recent corporate filing with the Florida Department of

Corporations identifies RIVIERA's Registered Agent for service of process as Ryan M. Angel,

101 E. Kennedy Blvd., Suite 2700, Tampa, Florida 33602 and states that RIVIERA's Business /

Mailing Address is 2801 SE Monroe St., Stuart, Florida 34997.

2

8.     RIVIERA is subject to the personal jurisdiction of this Court, as an entity operating, conducting, engaging in or carrying on a business venture in the state of Florida or having an office or agent in Florida or otherwise:

(a) Committing a tortious act and other negligent conduct within this state as hereinafter described;

(b) Engaging in substantial and not isolated activity within this state;

(c) Engaging in solicitation, advertising, marketing, or service activities within this state;

(d) Producing materials, or things processed, serviced, or manufactured used or consumed within this state in the ordinary course of commerce, trade, or use;

(e) Causing injury to persons or property within this state arising out of a RIVIERA act or omission outside this state;

(g) Entering into contracts with and issuing product warranties to consumers, including WBL who purchased a Motor Yacht, in this state;

(h) Entering into contracts with and performing work, including warranty work, pursuant to contracts with WBL relating to a Motor Yacht;

(i) Breaching a contract in this state by failing to perform acts or negligently performing acts required by the contract in this state.

## GENERAL FACTUAL ALLEGATIONS

### WBL Purchases a New Riviera 72 Sport Motor Yacht

9.     WBL on December 17, 2021, purchased from OWYG a $5MM – 72 foot RIVIERA Sports Motor Yacht (72' SMY Hull #024), bearing HIN # RIY720224H122 and powered by two Man Engines [Port 710 5886 814 5886 and Starboard 710 5886 802 5886] and named the Yacht

3

"Won Buy Land," (collectively, the "Yacht"). WBL attaches and incorporates by reference herein a partial copy of the "Purchase Agreement," which WBL and OWYG signed as Exhibit "A" (the "Contract").

10.     A marketing photograph of a like vessel is found on OWYG's website 72-smy-1.webp (1440×1080) (owyg.com), and WBL's Yacht looks very much like this:



11.     RIVIERA is an Australian boat builder, which manufactures various models of motor yachts, including the 72' Sport Motor Yacht that is the subject of this Action.

12.     OWYG is a retail Dealer of various lines of boats, including the RIVIERA line and the Yacht sold to WBL.

13.     Shortly after delivery of the Yacht, WBL began experiencing a fuel system leak, spilling fuel into the hull and on the Yacht deck.

14.     RIVIERA and OWYG had multiple opportunities to cure the defect, but failed.

4

51535684v1 05726.0009

*The Yacht Warranties*

15.    RIVIERA provides a 2-year Express limited warranty. *See* Riviera Warranty, which

CatCo attaches and incorporates fully herein as Exhibit "B."

16.    OWYG provides warranties required under Florida law, which includes those under

the MMWA. *See* Contract, Ex. "A," ¶ 8, page 2 of 4.

*The Non-conformities giving rise to the Breach of Warranty:*
*The First Repair Attempt*

17.    Barely two weeks into ownership of the Yacht, WBL's Captain discovered a

leaking fitting going to the secondary, standby generator.

18.    The fitting leak spilled diesel fuel on to the Yacht deck.

19.    Extremely concerned about the leak and the possibility of a fire or explosion, WBL

immediately contacted OWYG to repair and stop the fuel leak.

20.    OWYG took two days to send a Technician to address what became the first of

many fuel system leaks.

21.    The OWYG Technician claimed to have repaired the leak by tightening all hose

fittings.

22.    The Technician reported he found the port fuel tank emergency shut-off valves

completely disconnected – an unfathomable danger to anyone aboard.

23.    Of course, WBL could not use the Yacht in January 2022 until the Dealer fixed the

leaking fuel system fitting.

*The Second and Third Repair Failed Attempts*

24.    After the OWYG's first attempt to repair the Yacht's leaking fuel system, WBL's

"Underway Hours" for the each month were approximately 11.5 hours in January, 48 hours in

February, 51 hours in March, 21 hours in April, 30 hours in May, 0 hours in June, 10 hours In July, and 8 hours in August.

25.     The fuel system continued to spill fuel into the Yacht, and only got worse.

26.     Diesel fuel is a chemical that has a negative impact on the environment both during and after its consumption.

    a.     Liquid diesel is poisonous if spilled, discharged, or leaked outdoors it threatens plant and animal species, particularly aquatic life that has contact with it.

    b.     Diesel fuel can threaten not only the animals and fauna coated by a spill, but it also contaminates ground water and affects recreation; fisheries; industrial, potable water supply; and irrigation.

    c.     Diesel fuel is also a highly combustible petroleum product regulated by the federal government because of its flammable nature. Used as a burning fuel, this chemical must be stored, transported, and handled with care to avoid the risk of exposure to flame and sparks. The hazards of working with diesel include the risk of fire and explosion, situations that can result in property damage, physical injury, and even loss of life.

27.     In May 2022, while underway and with the owner and guests aboard and unbeknownst to the crew and passengers, the Yacht's starboard engine tank and fuel-line started leaking.

28.     OWYG sent a Technician, who simply used absorbent towels to clean up the spill.

29.     The next morning when the Captain went to the boat dock, he saw that the bilge had pumped a large amount of diesel fuel into the water around the Yacht and dock.

30.     Once on-board, the Captain learned that the fuel tank monitoring system showed that the tank had lost 100-120 gallons of diesel fuel.

6

31.     The overnight failure resulted from the flange fitting and sealant failing.

32.     All of that lost fuel first spilled into the vessel and after a certain amount had accumulated, the Yacht's bilge pumped the diesel fuel directly into the water, which caused an environmental incident.

33.     The spill necessitated an emergency pump-out and clean up, and another replacement of the Yacht's fuel system fittings.

34.     WBL took the Yacht to OWYG's Fort Lauderdale location for the urgently needed fuel system repairs and correction of other punch-list deficiencies and defects.

35.     Despite the repair attempt, the tank and fuel system failed a second and then a third time caused additional environmental contamination.

36.     In an eight-month after WBL purchased the Yacht, the Dealer OWYG and the Manufacturer – RIVIERA – had the $5MM+ Yacht in their possession for nearly four of the eight months of ownership.

37.     During WBL's possession of the Yacht, the nonconformity has repeated itself.

        a.      RIVIERA and OWYG's inability to repair and lack of tangible adequate assurances of the effectiveness of the repairs engendered a complete lack of confidence in the Yacht Manufacturer, the Dealer, and Yacht itself.

        b.      The nonconformity, which has already caused risk to life and actual environmental damage, has a very real chance of recurring, which neither platitudes nor the hollow reassures repeated by RIVIERA and OWYG after each recurrence assuage.

**The WBL Yacht is not the only Riviera yacht to suffer the nonconformity**

38.     As the foregoing shows, the Yacht is "damaged goods," a stigma the Yacht will carry forward and that diminishes the value.

7

39. On information and belief, WBL is informed, the nonconformity in the fuel system is not an isolated to the WBL Yacht or the Riviera 72 SMY.

40. On information and belief, WBL is informed that more than a dozen various models in the RIVIERA yacht line have and are experiencing this same leaking fuel system nonconformity.

41. Diesel fuel is flammable and combustible, and poses a danger to life.

42. Flammable means it is prone to catch fire and combustible means it may explode when ignited.

43. The WBL Yacht carries 2,695 US gallons (net tank capacity) of highly combustible and environmentally dangerous diesel fuel in three tanks, when the tanks are full.

**OWYG returns the Yacht to WBL**

44. After more than a month undergoing repairs at OWYG's facilities, on August 27, 2022, RIVIERA and OWYG returned the Yacht to WBL.

45. WBL's Captain and Mate took possession of the Yacht and made a limited cruise from the Marina to WBL's home dock in Boca Raton, where the Yacht sits – unused, but still requiring daily attention and maintenance.

46. The Yacht is not as represented because of the threat of the non-conformity returning while underway, a threat to life of those aboard.

47. WBL has not used the Yacht because of the resulting the matters discussed herein and because of the total lack of confidence in the going forward safety of the Yacht, which WBL intended be used solely for the personal use of the Owner of WBL, family, and friends.

48. WBL performed or each Defendant waived any condition precedent to bringing this Action.

8

49.     WBL retained the undersigned counsel to represent it in this Action and WBL is obligated to pay all costs of suit and reasonable attorneys' fees.

## COUNT I – REVOCATION OF ACCEPTANCE

50.     WBL realleges and revers allegations 1 through 49 as if specifically set forth fully herein.

51.     On December 17, 2021, WBL and OWYG entered a written Contract, by terms of which WBL agreed to purchase the Yacht.

52.     OWYG delivered the Yacht and WBL accepted the Yacht and paid the full price of US $5,019,495.00. *See* Ex. "A" signed purchase Contract.

53.     Unbeknownst to WBL, the fuel system nonconformity existed at the time of sale and delivery of the Yacht.

54.     By May 2022, WBL discovered the goods did not conform to the Contract inasmuch as the fuel system leaks persisted and other items were not completed.

55.     Even though OWYG and RIVIERA undertook the responsibility, under written warranties, neither RIVIERA nor OWYG could conform the Yacht to its intended purpose even though they had possession of the Yacht four out of the eight months WBL has owned the Yacht.

56.     WBL could not have known the extent of such defects before early summer, 2022 because, among other things, OWYG and RIVIERA had exclusive control over the Yacht and kept making promises about the repairs, which neither of them kept.

57.     The defects in the fuel system severely and substantially impair and diminish the value of the Yacht to WBL as "damaged goods."

58.     The defects in the fuel system severely and substantially impaired the value of the Yacht to WBL, because WBL intended to use the Yacht in Massachusetts during this entire

9

summer and into the fall before returning to South Florida, for which purposes WBL could not use the Yacht at all.

59.     A reasonable person would find that multiple fuel system failures causing hundreds of gallons of fuel spilling into the Yacht while underway is a non-conforming and life-threatening defect.

60.     A reasonable person would find that multiple unrepaired fuel system failures spilling hundreds of gallons of fuel into the Yacht would undermine anyone's confidence in the safety and seaworthiness of the Yacht.

61.     By written Notice, WBL revoked the previous acceptance of the Yacht, pursuant to Section 672.601 et seq. of the Florida Statutes. WBL attaches and incorporates by reference a partial copy of the Notice of Revocation on OWYG and RIVIERA as Composite Exhibit "C" (the "Notice").

62.     At the time WBL gave OWYG and RIVIERA Notice on August 17, 2022, the goods were in substantially the same defect condition as when OWYG and RIVIERA took possession of the Yacht for the last attempts to repair.

63.     Since redelivery of the Yacht on August 26, 2022, WBL has done nothing to harm the Yacht.

64.     Since August 26, 2022, WBL has held and still holds the goods for OWYG and RIVIERA, and on repayment to WBL of the purchase price, together with WBL's damages and costs.

65.     WBL is ready, willing, and able to deliver the Yacht to OWYG and RIVIERA, before WBL covers and markets the Yacht for sale, in order to cover and mitigate WBL's damages.

10

66.     As a direct result of OWYG and RIVIERA's refusal to revoke WBL's purchase Contract, WBL has suffered damages of US $5,097,968.68.

67.     WBL has also suffered incidental and consequential damages justifiably incurred, and which continue to accrue since RIVIERA and OWYG refuse to take the Yacht back.

WHEREFORE, Plaintiff Won Buy Land, LLC prays this Honorable Court enter judgment for WBL and against OWYG and RIVIERA and:

A.     Decree the Contract of Sale be revoked and decreed to be null and void by reason of the facts described above;

B.     Decree, on such revocation, that Won Buy Land, LLC have judgment against OWYG and RIVIERA, jointly and severally, for the sum of US $5,019,495.00, such being the amount of the purchase price of the goods paid on the Contract of sale, along with pre and post-judgment interest thereon from date of the Contract;

C.     Award WBL costs of suit, contractual or statutory attorneys' fees; and

D.     Grant WBL such other and further relief as the Court may deem just and proper.

## COUNT II – BREACH OF UCC AND MAGNUSON MOSSWARRANTY ACT EXPRESS WARRANTY

68.     WBL realleges and revers allegations 1 through 49 as if specifically set forth fully herein.

69.     OWYG promoted and warranted Riviera yachts.

70.     For example, OWYG touts on its webpage that Riviera yachts are "built for serious cruising with safety and comfort in mind and" are "durable, strong, and reliable." Specifically, OWYG at Riviera 72 Sports Motor Yacht - One Water Yacht Group (owyg.com) states:

11

SPORTS MOTOR YACHT COLLECTION

Designed for long-range cruising, the Riviera Sports Motor Yacht range provide a smooth, quiet ride, refined interiors, and superior craftsmanship at every turn. From 50 to 72-feet, this model line is versatile and can either be outfitted for serious offshore fishing or for luxury cruising. The ultra-modern design is ideal for discerning boat owners that crave adventure along with the comforts of home.

VESSEL DESCRIPTION

Our largest, grandest, most spectacular design yet. Offers an incomparably vast cockpit and covered mezzanine dining area, spectacular standard power and long range capability.

Combines outstanding sports-inspired looks and sports performance with ultra-luxurious interiors.

Features fabulous foredeck entertainment area and enclosed flybridge with internal stairs. Enjoy the luxury of an optional crew cabin or utility space and the surety of wide side decks with raised bulwarks. Your choice of three or four magnificent staterooms and four bathroom designs.

Now experience extended cruising the Riviera Way.

## RIVIERA YACHTS FOR SALE

Tested in the rough waters around Australia, Riviera Yachts has grown to the largest manufacturer of blue-water luxury yachts in the Southern Hemisphere. Designed with full fiberglass hulls below the waterline, these yachts are built for serious cruising with safety and comfort in mind. Known for being durable, strong, and reliable, Riviera's models tend to have a higher re-sale value as well, which is why many owners stay within the brand as they move into larger or newer boats. The interiors of every Riviera are furnished with exceptional woods, fine fabrics, and the best equipment possible for cruising. With over 5,700 yachts built since its beginnings, Riviera has truly perfected its craft.

As a factory-trained Riviera dealer that continually stocks new models at multiple locations, One Water Yacht Group offers an unparalleled buying experience through exceptional service support, personal owner training, and customer rendezvous events. From the Northeast to South Florida, our industry-leading service teams can assist you with all routine maintenance and installation of after-market equipment. Best of all, we can take your current boat in on trade towards the purchase of a new Riviera and even assist with financing. Experience the difference that comes with buying a Riviera Yacht with OWYG and live the dream you've created.

71.     WBL purchased the Yacht from OWYG in December 2021.

72.     In connection with the sale, OWYG expressly warranted that WBL enjoyed warranties "as may be required under applicable state law" and adopted RIVIERA's warranty.

73.     RIVIERA too provided an express warranty, which states in part:

12

**LIMITED EXPRESS NON-STRUCTURAL WARRANTY**: Riviera warrants that for two (2) years after the date of delivery or eight hundred (800) hours (the earlier of), to the first retail purchaser, and for the period before it is delivered to the first retail purchaser, all vessel components manufactured by Riviera shall be free from defects due to material or workmanship under normal non-commercial use. On components not manufactured by Riviera, Riviera shall assign to the first retail purchaser the warranties extended by those manufacturers as allowed.

*See* RIVIERA Warranty, attached as Ex. "B".

74.    Each Defendant provided an express warranty by affirmation of fact or promise, or description of the Yacht.

75.    The Yacht failed to conform to OWYG or RIVIERA's affirmation or description.

76.    WBL notified RIVIERA and OWYG of the nonconformities in the goods on August 17, 2022, which was a reasonable time after WBL discovered the breach.

77.    Because of the breach of warranty, WBL has suffered damages represents by the difference between the value of the Yacht as delivered, US $5,019,495.00, and the value the Yacht would have had if the Yacht had been as warranted or, alternatively, the difference between the price paid and the amount received when the Yacht is sold.

78.    The breach of warranty also caused incidental and consequential damage of US $78,423.68 as of August 17, 2022, which are ongoing and accruing and include: camera in galley - $1,072.6; - engine and generator services - $10,970.66; - props, shaft, bottom paint - $16,042.42; - Fighting chair & pedestal $11,127.00; - upgraded charts for electronics $2,636.00; - re-rigged outriggers and hardware $1,100.00; - ceramic coated windows and outriggers - $3,400.00; - monthly divers bottom cleaning $235.00 x 4 months $940.00; insurance $27,675.00; and transportation, crew movements with Yacht related to nonconformity $3,460.00.

WHEREFORE, Plaintiff Won Buy Land, LLC prays this Honorable Court enter judgment for WBL and against OWYG and RIVIEREA and:

A.    Award WBL the difference between the value of the Yacht as delivered, US $5,019,495.00, and the value the Yacht would have had if the Yacht had been as warranted or,

13

alternatively, the difference between the price paid and the amount received when the Yacht is sold,

    B.    Award WBL incidental and consequential damages, plus costs, fees, reasonable statutory attorneys' fees, and

    C.    Award WBL such other and further relief as the Court may deem just and proper.

**COUNT III – BREACH OF UCC AND MAGNUSON MOSS**
**IMPLIED WARRANTY OF MERCHANTABILITY**

79.    WBL realleges and revers allegations 1 through 49 as if specifically set forth fully herein.

80.    WBL brings the legal Claim alleged in this Count pursuant to Florida Statute §672.314, *et al.* and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et al* ("MMWA").

81.    The Yacht is a "consumer product" within the contemplation of the MMWA.

82.    RIVIERA is was the commercial manufacture, supplier, merchant, and/or seller of the Yacht and was the commercial manufacturer, supplier, merchant and seller of similar motor vessels to the public, including WBL, within the contemplation of Section 672.314, *et al.* and the MMWA.

83.    WBL is a "consumer" within the definition in the MMWA.

84.    WBL purchased the Yacht from OWYG on December 17, 2022, a 72' SMY hull number 024, a photograph of like vessel is found promoting Riviera yachts on OWYG's website 72-smy-1.webp (1440×1080) (owyg.com) is found *supra* in paragraph 10.

85.    RIVIERA and OWYG expressly and impliedly warranted that WBL could use the Yacht because it conformed to the high standard of merchantable quality, safety, and condition.

86.    RIVIERA and OWYG, warranted that the Yacht was fit for the ordinary purposes for which it was to be used – long-range cruising and sport fishing; would run as vessels similar

14

in kind, price and quality; was adequately and accurately built to specifications; and would conform to all affirmations of fact made regarding the quality and performance of the boat.

87.     RIVIERA and OWYG each warranted that the Yacht:

    a.     would pass without objection in the trade;

    b.     was of fair average quality;

    c.     was fit for the ordinary purposes for which it was to be used;

    d.     would run as vessels similar in kind, price and quality;

    e.     would be adequately and accurately labeled; and

    f.     would conform to all affirmations of fact made regarding the quality and performance of the vessel.

88.     WBL was a foreseeable purchaser and a foreseeable user, who relied on the warranty and used the Yacht as intended and for the ordinary purpose for which constructed and sold, (e.g., sport fishing).

89.      The Yacht, when manufactured, sold, and/or delivered suffered from defects that go beyond mere commissioning issues, including for example the repeated failure of the fuel system, which were unreasonably dangerous to the user and consumer – WBL and WBL guests who were onboard while the Yacht idled at anchor or dock, or while underway.

90.     OWYG delivered the Yacht as a "true long range" sport (fishing) motor vessel manufactured under "exacting RIVIERA standards", but the Yacht was not of merchantable quality, was unfit, unsafe, and unusable (e.g., as the persistent fuel system leak demonstrates) for the ordinary purpose for which intended, which demonstrates the Yacht was non-conforming.

91.     RIVIERA breached the Implied Warranty of Merchantability and Usage of Trade by failing to properly design, inspect, test, construct, manufacture, and outfit the Yacht and by delivering a vessel that was unfit for ordinary use as outlined herein.

92.     RIVIERA's Warranty was in effect, therefore preventing it from disclaiming the implied warranty of merchantability, trade, and usage.

93.     The cause and origin of the damages was the result of RIVIERA's breach of the Implied Warranty of Merchantability imposed by Fla. Stat. § 672.314 et al. and the Magnuson-Moss Warranty Act, 15 USC § 2301 et al.

94.     WBL timely notified RIVIERA and OWYG of the warranty issues, design, and construction defects, which render the Yacht un-merchantable.

95.     As a direct and proximate result of RIVIERA's breach of warranty, Plaintiff, Won Buy Land, LLC, suffered damages to the full extent of the purchase price of the Yacht, in addition to consequential, indirect and incidental expenses – as well as attorneys' fees pursuant to the Magnuson Moss Warranty Act, 15 USC §2301, et al.

WHEREFORE, Plaintiff Won Buy Land, LLC prays this Honorable Court enter judgment for WBL and against OWYG and RIVIERA and:

A.     Decree the Contract of Sale be revoked and found to be null and void by reason of the facts described above;

B.     Decree that on such revocation Won Buy Land, LLC have judgment against OWYG and RIVIERA, jointly and severally, for the sum of US $5,019,495.00, such being the amount of the purchase price of the goods paid by plaintiff on the Contract of sale, along with pre and post-judgment interest thereon from date of the Contract;

C.     Award Won Buy Land, LLC costs of suit and statutory attorneys' fees; and

16

    D.    Grant Won Buy Land, LLC such other and further relief as the Court may deem just and proper.

Dated: September 2nd, 2022

Respectfully submitted,

/s/Haas Hatic
HAAS HATIC
Florida Bar No: 0843989
Primary: haas.hatic@gmlaw.com
Secondary: rene.vazquez@gmlaw.com
GREENSPOON MARDER LLP
200 East Broward Blvd., Suite 1800
Fort Lauderdale, Florida 33301
954.491.1120 (Telephone)
954.343.6956 (Facsimile)
Attorneys for Plaintiff

17

**Won Buy Land, LLC vs. Midwest Assets &
Operations, LLC d/b/a OneWater Yacht
Group and Riviera Marine (Int.) Pty. Ltd.,
<u>Inc. d/b/a Yachts of the Americas</u>**



# Exhibit A

# Purchase Agreement

## OneWater Yacht Group

OneWater Yacht Group
101 N. Clematis,  West Palm Beach,  FL  33401
(561) 296-9800

700150

Date: 12/01/2021
Closing Date: 12/17/2021

**Buyer:**  WON BUY LAND, LLC   **Co-Buyer:**

**Address:** 710 LAKE DRIVE

**C/S/Zip:** BOCA RATON, FL 33432

Salesperson: NED DOZIER - MDGR

**Phone: M:** ▮  **H:**  **W:**  **Email:** ▮

This Purchase Agreement ("Agreement") is between me as buyer (jointly and severally if more than one and together called the "Buyer") and you as selling dealer (the "Dealer"). The term "Unit" refers collectively to the product(s), optional equipment, accessories and services described below which Buyer is purchasing. Subject to the terms and conditions on this page and the Additional Terms and Conditions beginning on page 2 of this Agreement, Dealer agrees to sell and Buyer agrees to purchase the following described Unit(s). The Dealer's location is the address shown above.

| YEAR | MAKE | MODEL | HIN/VIN/SERIAL NO. | STOCK NO. | |
|------|------|-------|--------------------|-----------|-|
| 2022 | RIVIERA | 72 SMY | RIY72024H122 | NC62881 | New |
| 2021 | MAN | V12 | 71058868145886 | NC62881E | New |
| 2021 | MAN | V12 | 71058868025886 | NC62881E.0 | New |

### OPTIONAL EQUIPMENT & ACCESSORIES

Awning Camera Awning Camera Mounted to Stainless Rail
Engine Room Camera Garmin GC 200 IP Dome Camera (Infra
Dual 12V 40A heavy-duty plug and socket (1 x port and 1 x
Targa Uplighting Lumitec Echo White x 6 to light Sat Domes
Install gaff storage tube with hinged GRP lid installed to
 Underwater Lighting (5 x Transom Lights) Lumitec SeaBlaze
Garmin G-WIND wireless 2 Wind transducer fitted to Navigat
Cockpit Camera Garmin GC 200 IP Dome Camera (Infra Red)
AIS Garmin AIS 800 Transceiver including GA 38 GPS/GLON
Auto Pilot
Radar Garmin 12KW GMR1224XHD2 Open Radar 5" Se
Hardtop, Targa & Rear GRP Rail to be painted RIVIERA PLAT
Sounder/Transducer Panoptix (standard transducer and sound
Sounder/Transducer Panoptix (standard transducer and sound
Aft Helm Screen 1 x 17" Garmin Glass Bridge 8417 linked to
Screens 3 x 24" Garmin Glass Bridge 8424 inc GPS & GRID c
Upgrade master stateroom blinds to (electric)
Timber - WALNUT interior including high GLOSS finish varni
GALLEYWARE PACKAGE (40pce Cutlery set, 40pce Dinner s
BATHWARE PACKAGE (10 x Beach towels, 10 x Bath towels,
ElectroSea Clearline System 990
Soft Furnishing Package (includes fitted bed linen, pillow
Flybridge - Upholstery to Flybridge Lounges - Leather or S
Saloon - Upholstery to Port & Stbd Lounges - Leather or Su
Premium grade vinyl flooring to Galley and Saloon area wit
Flybridge main helm station to have separate bow & stern t

Solid surface bonchtop to flybridge Items: P
Blast shade to cover lounging area. With 5 rom
Lounge upgrade, additional two inboard facing
Awning- Rear awning to flybridge hardtop (Ac
Half rear awning (acrylic canvas) Items: Sea
Hull - White
Boot and Pin stripe the same colour Items: B
Convert utility room to crew cabin with sing
Extra - Cockpit Joystick to be mounted on Sta
Presidential layout - Master head located in
Clean array Radar and Sat TV dome dual mount
Dual Mount (Required all models when only 1
Loudhailer connected to VHF (Speaker only, n
KVH Dummy Dome KVH TV7 Empty Dome (Dummy dom
Separate Miele washer (below) Dryer (above).
Watermaker Model: Blue Water Legend 1850-1 I
Icom Command Microphone Icom Command Microph
Insinkerator, fitted to galley outbound smal
Thermal - (FLIR) M232 Thermal Camera (320 x
Sounder/Transducer CHIRP Garmin GSD 26 CHIRP
Windscreen tinted and tempered glass, curved
Rubber Backed Saloon carpet inlay - TROIKA M
Fixed TEAK small fishing platform, 400mm (1"
Cockpit Speaker upgrade - Speaker upgrade to
Sat TV to be connected to all TVs on board -
Live bait tank fitted to transom coaming wit

### OPTIONS TO BE ADDED

*DEAL TO CLOSE BY 12/17/21*

*$1,000,000 DEPOSIT UPON CONTRACT SIGNING*

*$250,000 DEPOSIT WILL BE RETURNED TO RKH*

*FULL FUEL, CG SAFETY KIT, LINES, FENDERS,
TRANSOM NAME INCLUDED*

### TRADE INFORMATION

| YEAR | MAKE | MODEL | HIN/VIN/SERIAL NO. |
|------|------|-------|--------------------|
| | | | |

**TRADE LIEN PAYOFF AND LIENHOLDER INFORMATION PROVIDED BY BUYER.**
Payoff Amount:  N/A  Payoff To: N/A

Buyer and Dealer understand that this Agreement is subject to necessary corrections and adjustments concerning changes in the payoff of trade-in to be made at the time of settlement – see Section 13 of page 2 of this Agreement.

Florida documentary stamp tax required by law in the amount of $ ____ has been paid or will be paid directly to the Department of Revenue. Certificate of Registration No.  16-8017244950-3  .

\* This charge represents costs and profit to the dealer for items such as inspecting, cleaning, adjusting vehicles, and preparing documents related to the sale.

\*\* Buyer agrees to finance with or through Dealer.   (initials) ____  (initials) ____

\*\* BUYER AGREES TO COMPLETE THE PURCHASE OF THE UNIT ON OR BEFORE THE FOLLOWING DATE (UNLESS DEALER NOTIFIES BUYER OF A LATER CLOSING DATE):  12/17/2021   (initials) ____  (initials) ____

I ALSO AGREE THAT THE UNPAID BALANCE WILL BE PAID EITHER: by execution of a Retail Installment Contract, promissory note or other financing agreement and its acceptance by a financial source; cash; bank wire; or certified check.

All deposits and down payment(s) are non-refundable unless explicitly stated in this Agreement. The receipt of which is acknowledged by Dealer this date.

Buyer certifies that Buyer has read, understands, and agrees to these terms and the Additional Terms and Conditions attached hereto this Agreement and that they are part of this Agreement the same as if they were printed above Buyer's signature.

Signed  (X) _____  Buyer ____  Date ____

Signed  _____  Co-Buyer ____  Date ____

Dealer:  _____  Date ____
Not valid unless signed by authorized representative of the dealer.

### ITEMIZATION

| | |
|---|---|
| List Price | $5,390,284.00 |
| Savings & Incentives          7.2% | -390,284.00 |
| Freight | 0.00 |
| Prop | 0.00 |
| Added Options (not part of original equals) | 0.00 |
| **Purchase Price** | **$5,000,000.00** |
| Less Trade-In Allowance | N/A |
| Cash Difference | $5,000,000.00 |
| Service Contract | 0.00 |
| ServiceGuard | 0.00 |
| Vessel Monitoring | 0.00 |
| Tire & Battery Fee (if applicable) | 0.00 |
| Documentation Fee to Dealer \* | 1,195.00 |
| **Balance** | **$5,001,195.00** |
| Taxes | 18,000.00 |
| Registration & Title Fees | 300.00 |
| Electronic Title Registration Fee | 0.00 |
| Trade Payoff | 0.00 |
| Florida Doc Stamp Tax, if applicable | 0.00 |
| UCC Filing Fee | 0.00 |
| Coast Guard Documentation Fee | 0.00 |
| Less Cash Down Payment | 5,019,495.00 |
| Less Factory Rebates | 0.00 |
| **Unpaid Balance** | **$0.00** |

HC# 4841-3795-1981 – 6/21 v2.7 Y-N
Florida
12/16/2021 7:08 PM

700150

## ADDITIONAL TERMS AND CONDITIONS

By signing below, Buyer and Dealer further agree to the following additional terms and conditions (continued from page 1 of this Agreement):

1. **IF NOT A CASH TRANSACTION.** If the purchase of the Unit is to be financed by a retail installment sales contract, this Agreement is subject to credit approval and assignment of a retail installment sales contract by the Dealer to a financial institution prior to or at the time of delivery and the Annual Percentage Rate (APR) may be negotiated with Dealer and Dealer may receive compensation for arranging financing on Buyer's behalf. If financing is arranged, Buyer understands that Buyer will enter into a retail installment sales contract, promissory note or other agreement as may be required to finance the purchase. If the Unit is delivered prior to final finance approval and funding of Unpaid Balance Due, Buyer understands that if third party financing approval or assignment of a retail installment sales contract is not obtained, then (i) Buyer may pay the entire Unpaid Balance Due in cash, bank wire or certified check, or (ii) Dealer may cancel the Agreement and Buyer must immediately return the Unit to Dealer.

2. **TITLE.** Title to the Unit purchased will remain in Dealer until the Unpaid Balance Due is paid in full in cash, bank wire or certified check, or Buyer has signed a retail installment sales contract or promissory note and it has been accepted by the bank or finance company, at which time title to the Unit will pass to Buyer (subject to any security interest in favor of the bank or finance company) even though the actual delivery of the Unit purchased may be made at a later date. In the event that the bank or finance company does not accept the executed retail installment sales contract or promissory note, title to the Unit will remain with Dealer and Buyer will be notified to return the Unit immediately on notification and in the same condition as delivered by Dealer to Buyer. In the event Buyer does not immediately return the Unit on notification, Buyer will be responsible for Dealer's expenses to retrieve the Unit to include reasonable attorneys' fees, as permitted by Applicable Law.

3. **REAPPRAISAL OF TRADE-IN.** If Buyer is making a trade-in whether or not it is not delivered to Dealer at the time of the original appraisal it is subject to reappraisal on its delivery or at the time of closing if there are any latent defects or other defects not readily apparent or if there have been material changes made in the furnishings or accessories, or in its general physical condition. Buyer understands and agrees that this later appraisal value will then determine the allowance to be made of the trade-in.

4. **FAILURE TO COMPLETE PURCHASE.** If Buyer fails or refuses to complete this purchase on or before the "Buyer Agrees to Complete the Purchase on or Before" date as identified on page 1 of this Agreement, or within a mutually agreed on extension of time, for any reason (other than cancellation because of an increase in price), Buyer will be in default of this Agreement. Failure to timely accept delivery will give Dealer the right to dispose of any trade-in, treat any cash consideration received as a deposit or down payment and retaining the same, as permitted by Applicable Law, and at our option, the right to retain any deposit or down payment and pursue any other remedy available under the law or in equity (with appropriate credit for any forfeited deposit or down payment or the value of any trade in retained by us) to adequately compensate our incidental and consequential damages and all other damages, costs, expenses, or losses Dealer may incur because Buyer failed to complete this purchase, as permitted by Applicable Law. If Buyer paid any negative equity balance on the trade-in, Buyer will pay Dealer the amount paid on Buyer's behalf.

5. **CHANGES BY MANUFACTURER.** Buyer understands that the manufacturer of the Unit may make any changes in the model, or the designs, or any accessories and parts from time to time, and at any time. If the manufacturer does make changes to units other than the Unit, neither Dealer nor the manufacturer are obligated to make the same changes in the Unit Buyer is purchasing.

6. **TAXES.** Buyer understands that the price of the Unit Buyer is purchasing does not include taxes imposed by a governmental agency or authority prior to or at the time of delivery unless it is written on the page 1 of this Agreement. Buyer assumes and agrees to pay, unless prohibited by Applicable Law, any and all taxes, except income taxes, that may be chargeable to Buyer's purchase, regardless of the person having the primary tax liability.

7. **DELAYS.** Buyer will not hold Dealer liable for delays by the manufacturer, inability to obtain parts timely, accidents, acts of God, strikes, flood, fires, national or regional emergency, or any other cause beyond Dealer's control or without Dealer's fault or negligence.

8. **EXCLUSION OF WARRANTIES.** If Buyer's address on page 1 of this Agreement is located in a state other than Maryland, this provision applies: BUYER UNDERSTANDS THAT THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES EXPRESS OR IMPLIED ARE EXCLUDED BY DEALER FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE UNIT, TO THE EXTENT PERMITTED BY APPLICABLE LAW. BUYER UNDERSTANDS THAT DEALER MAKES NO WARRANTIES WHATSOEVER REGARDING THE UNIT NOR FOR ANY APPLIANCES OR COMPONENTS CONTAINED THEREIN, EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW. BUYER AGREES TO LOOK EXCLUSIVELY TO THE MANUFACTURER OF THE UNIT OR COMPONENT OF THE UNIT, AS APPLICABLE, AND WAIVES ANY CLAIM FOR WARRANTY AGAINST DEALER. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BUYER AGREES TO INDEMNIFY DEALER FOR ALL COSTS OF DEFENSE AND DAMAGES IF BUYER OR ANY PARTY CLAIMING BY OR THOUGH BUYER ASSERTS ANY CLAIM FOR ANY MANUFACURING OR DESIGN DEFECT AGAINST DEALER. If Buyer's address on page 1 of this Agreement is located in Maryland, this provision applies: BUYER UNDERSTANDS THAT ALL EXPRESS WARRANTIES ARE EXCLUDED BY DEALER FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE GOODS SOLD. BUYER UNDERSTANDS THAT DEALER MAKES NO EXPRESS WARRANTIES WHATSOEVER REGARDING THE UNIT NOR FOR ANY APPLIANCES OR COMPONENTS CONTAINED THEREIN, EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE LAW. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BUYER AGREES TO INDEMNIFY DEALER FOR ALL COSTS OF DEFENSE AND DAMAGES IF BUYER OR ANY PARTY CLAIMING BY OR THOUGH BUYER ASSERTS ANY CLAIM FOR ANY MANUFACURING OR DESIGN DEFECT AGAINST DEALER.

9. **EXCLUSION OF INCIDENTAL AND CONSEQUENTIAL DAMAGES.** To the extent permitted by Applicable Law, incidental and consequential damages arising out of the sale, use, servicing and/or quality of the Unit, including but not limited to, any loss of use, loss of time, inconvenience, aggravation, loss of wages, earnings or income, fuel and transportation expenses, hotel/motel costs, insurance, storage, rental or replacement, altered or cancelled trips and vacations, the cost of any food/meals and any other incidental and consequential damages are specifically excluded and WAIVED BY BUYER. Dealer specifically disclaims liability for any such incidental and/or consequential damages. Dealer similarly agrees not to seek or recover such incidental or consequential damages from Buyer. Buyer and Dealer acknowledge this disclaimer of incidental and consequential damages is independent of and will survive any failure of the essential purpose of any warranty or remedy.

10. **MANUFACTURERS WARRANTIES.** BUYER UNDERSTANDS THAT THERE MAY BE WRITTEN WARRANTIES COVERING THE UNIT PURCHASED, INCLUDING ANY APPLIANCE(S) OR COMPONENT(S) BEING PART OF THE UNIT. DEALER AGREES TO GIVE BUYER COPIES OF ANY AND ALL WRITTEN WARRANTIES SUPPLIED BY MANUFACTURERS IN DEALER'S POSSESSION. BUYER UNDERSTANDS AND AGREES THAT THE EXPRESS TERMS OF ANY MANUFACTURERS' WRITTEN WARRANTY, TO THE EXTENT ANY EXIST AND APPLIES TO THE UNIT, AND THAT SUCH MANUFACTURER'S WARRANTY SHALL CONTAIN AND CONSTITUTE BUYER'S EXCLUSIVE AND SOLE REMEDY FOR ANY PROBLEMS OR DEFECTS THE UNIT MIGHT CONTAIN.

11. **INSPECTION.** When Buyer takes delivery of the Unit, Buyer will be deemed to have examined the Unit and found it suitable for Buyer's particular needs. Buyer has relied upon Buyer's own judgement and inspection in determining that it is of acceptable quality. Buyer has the right to have the Unit surveyed by a licensed marine surveyor prior to Buyer taking possession of the Unit. If Buyer fails to do so prior to taking possession Buyer shall have waived such right and shall be deemed to have accepted the Unit as conforming to the Agreement.

12. **INSURANCE.** Buyer understands it is Buyer's responsibility to secure insurance for the Unit. Buyer will not hold Dealer responsible for any claims due to loss or damage whatsoever to the Unit after Buyer received possession whether or not Buyer removed the Unit from Dealer's property.

Signed: _____
Buyer Name: HARRY   PATTEN

Signed: _____
Co-Buyer Name:

TC Multi-State 7/21 v1.2
12/16/2021  7:08 PM

**Won Buy Land, LLC vs. Midwest Assets &
Operations, LLC d/b/a OneWater Yacht
Group and Riviera Marine (Int.) Pty. Ltd.,
<u>Inc. d/b/a Yachts of the Americas</u>**

# Exhibit B

# Riviera Australia Pty Ltd.
# LIMITED EXPRESS WARRANTY

*Riviera Australia Pty Ltd. A.C.N. 139 663 906 (**Riviera**) makes this Limited Express Warranty (**Warranty**) to the original retail purchaser of a vessel manufactured by Riviera, provided the vessel is purchased from an authorized Riviera dealer and said first retail purchaser registers this Warranty with Riviera within 30 days of the purchase. This Warranty is the only warranty provided by Riviera, express or implied, with respect to any vessel manufactured by Riviera. Effective from 202 Pricing, 64SM hulls #010 and beyond, 68SM/72SM hulls #022 and beyond, Belize all hulls completed after 30 June 2020.*

**LIMITED EXPRESS STRUCTURAL WARRANTY**: Riviera warrants to the first retail purchaser that for seven (7) years or two thousand eight hundred (2,800) hours (the earlier of), after the date of delivery to the first retail purchaser, and for the period before it is delivered to the first retail purchaser, that the hull, deck, fly bridge and hardtop shall be free from structural defects due to material or workmanship, under normal non-commercial use, that result in any delamination or separation of the stringers or composite structure.

Vessels that go into a syndication or shared ownership program or used for commercial purposes are entitled to these same structural warranty terms, subject to fair wear and tear on the Vessel.

A structural defect includes the following:
(a)     Structural failure of the fiberglass hull, deck, flybridge and hardtop;
(b)     Structural failure of any parts glassed onto the above components; or
(c)     Structural failure of the joints between any of the above components.

The structural warranty does not apply to the following:
(a)     A water leak through the joints between the hull, deck, flybridge and hardtop;
(b)     Fiberglass small parts failures;
(c)     Parts that are not manufactured by Riviera;
(d)     Interior failures, window or hatch failures;
(e)     Damage resulting from misuse, abuse, negligence, improper docking, alteration, vandalism, accident or lack of performance of normal maintenance;
(f)     Any charges incurred by any vessel returned to the factory, dealer or authorized agent for inspection prior to authorization of warranty repairs;
(g)     The cost of removal or reinstatement of a part, or disassembly or reassembly of the unit of which it is a component;
(h)     Heat and/or sun damage to the hull and/or gelcoat on hulls that are painted a dark color;
(i)     Owners other than the first retail purchaser, or in relation to the Hull only, subsequent owners to whom the structural warranty of the Hull has been validly transferred in accordance with this Warranty;
(j)     Any vessels sold to the first retail purchaser by anyone other than a Riviera dealer listed on website: rivieraaustralia.com on the date of the purchase (**Authorized Riviera Dealer**); or
(k)     Any item which Riviera has not been notified of within thirty (30) days of the issue becoming apparent.
The above list is not intended to be exhaustive and Riviera may, at its absolute discretion, elect to refuse any warranty claim whatsoever.

Transfer of structural warranty:
In reference to the structural warranty of the Hull ONLY, Riviera may agree in its sole and absolute discretion, to transfer the hull warranty to a subsequent owner of a vessel, who purchases the vessel from an Authorized Riviera Dealer, upon application and payment of a $600.00 USD transfer fee. Such transfer will only be effective upon confirmation in writing from Riviera. Where Riviera does approve the transfer of the remaining term of the hull warranty to a subsequent owner in writing, then such hull warranty will be transferred for a period of not more than a total period of seven (7) years or two thousand eight hundred (2,800) hours (the earlier of), from the date an Authorized Riviera Dealer first delivered the vessel to the first retail purchaser.

**LIMITED EXPRESS NON-STRUCTURAL WARRANTY**: Riviera warrants that for two (2) years after the date of delivery or eight hundred (800) hours (the earlier of), to the first retail purchaser, and for the period before it is delivered to the first retail purchaser, all vessel components manufactured by Riviera shall be free from defects due to material or workmanship under normal non-commercial use. On components not manufactured by Riviera, Riviera shall assign to the first retail purchaser the warranties extended by those manufacturers as allowed.

The non-structural warranty does not apply to the following:
(a)     Parts that are not manufactured by Riviera;
(b)     Any charges incurred by any vessel returned to the factory, dealer or authorized agent for inspection prior to authorization of warranty repairs;
(c)     The cost of removal or reinstatement of a part, or disassembly or reassembly of the unit of which it is a component;
(d)     Heat and/or sun damage to the hull and/or gelcoat on hulls that are painted a dark color;
(e)     The installation of any equipment by a dealer or other installer;
(f)     Any installation of products not to Riviera's recommended specifications, because of the possibility that the use of these Products will exceed Riviera or government specification for overpowering, steering, handling, speed and safety;
(g)     Any vessels sold to the first retail purchaser by anyone other than an Authorized Riviera Dealer;
(h)     Any item which Riviera has not been notified of within thirty (30) days of the issue becoming apparent.
(i)     Travel costs incurred if the boat is more than two (2) hours away from an Authorized Riviera Dealer or Riviera appointed warranty repairer;

2

The non-structural warranty for vessels that go into a syndication or shared ownership program expires after the earlier of eight hundred (800) hours of use or two (2) years from the date of delivery to the syndication or shared ownership program, whichever occurs first.

**EXCLUSIONS: These limited express warranties do not cover or extend to any of the following: (a) defects that are a result of normal wear and tear, commercial use, racing, rental, charter or military use, abuse, negligence, vandalism, lack of maintenance, casualty loss or docking damage; (b) alterations and modifications made without the written authorization of Riviera; (c) leaks in windows and hatches outside of the non-structural warranty period; (d) components manufactured by other manufacturer(s) (including, but not limited to, engines, transmissions, propellers, generators, electronics, batteries, air conditioning units and appliances); (e) tears, fading, discoloration or mildewing of fabric or upholstered components; (f) blistering, fading, chalking or cracking of any gelcoat, varnish, paint or metallic finish; (g) electrolysis, galvanic corrosion, crevice corrosion or any other deterioration of underwater components; (h) statements and representations that estimate the speed, weight, fuel consumption or other performance characteristics of the vessel and any statements, representations or warranties given by a dealer or any third persons, other than those given in this Warranty; and (i) any vessel, which has been overpowered so as to exceed the Riviera recommended horsepower specification**

**LIMITATIONS**

**RIVIERA SHALL NOT BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES OF ANY NATURE.**

**RIVIERA SHALL NOT BE LIABLE FOR ANY LOSS CAUSED BY OR ASSOCIATED WITH ANY DEFECT IN THE VESSEL FOR ANY REASON (INCLUDING NEGLIGENCE) OTHER THAN ITS OBLIGATION TO REPAIR OR REPLACE (AT RIVIERA'S SOLE DISCRETION) ANY DEFECTIVE PARTS IN ACCORDANCE WITH THIS WARRANTY.**

**THIS WARRANTY GIVES THE PURCHASER SPECIFIC LEGAL RIGHTS. THE RIGHTS AND REMEDIES OF THIS WARRANTY ARE EXCLUSIVE AND GIVEN IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WHETHER ARISING BY LAW, CUSTOM, CONDUCT OR USAGE OF TRADE, OTHER THAN THOSE WHICH MAY NOT BE EXCLUDED BY LAW.**

**THE PURCHASER MAY HAVE OTHER RIGHTS NOT STATED HEREIN AND THOSE RIGHTS MAY VARY AMONGST DIFFERENT STATES OR COUNTRIES, INCLUDING, WITHOUT LIMITATION, RIGHTS UNDER THE AUSTRALIAN CONSUMER LAW.**

**IN THE EVENT THAT IMPLIED WARRANTIES OR GUARANTEES ARE FOUND TO EXIST UNDER THE LAW OF A PARTICULAR STATE OR COUNTRY NOTWITHSTANDING THE EXCLUSION CONTAINED HEREIN, THE DURATION OF SUCH WARRANTIES SHALL BE LIMITED TO THE DURATION OF THE APPLICABLE LIMITED EXPRESS WARRANTY STATED HEREIN, TO THE EXTENT THAT SUCH LIMITATION IS PERMITTED BY LAW. TO THE EXTENT PERMITTED BY LAW, RIVIERA'S OBLIGATIONS (IF ANY) UNDER THE AUSTRALIAN CONSUMER LAW ARE LIMITED TO THE REPAIR OR REPLACEMENT OF THE DEFECTIVE PARTS, AT RIVIERA'S SOLE DISCRETION.**

**THE PURCHASER MUST SUBMIT THE WARRANTY REGISTRATION CARD WITHIN THIRTY (30) DAYS OF PURCHASE TO ACTIVATE WARRANTY COVERAGE. IF THE PURCHASER FAILS TO DO SO, THEY SHALL NOT BE ENTITLED TO CLAIM UNDER THIS WARRANTY AND WILL BE DEEMED TO HAVE PURCHASED THE VESSEL AS IS WITH NO WARRANTIES, EXPRESS OR IMPLIED.**

THE SELLING DEALER IS NOT AN AGENT OF RIVIERA OR A CO-WARRANTOR AND IS NOT AUTHORIZED TO AMEND OR MODIFY THIS LIMITED WARRANTY IN ANY MANNER OR ASSUME ANY LIABILITY OR EXPENSE ON RIVIERA'S BEHALF.

**WARRANTY CLAIM PROCEDURES**: All claims in relation to this Warranty must be made in accordance with the claim procedure described herein. The first retail purchaser must notify the Authorized Riviera Dealer from which they purchased the vessel (**Selling Dealer**) within thirty (30) days of discovering any defect. The first retail purchaser may request from the Selling Dealer an appointment to have the Selling Dealer examine the vessel, or at the Selling Dealer's election and by prior arrangement, the first retail purchaser may deliver the vessel to the Selling Dealer for examination. The Selling Dealer shall conduct the examination and submit to Riviera a service and parts request by email together with any documentation to support the claim. Upon receiving notice of defects covered by this Warranty from the Selling Dealer, Riviera must promptly take action, or authorize the Selling Dealer to take action, to repair or replace (at its absolute discretion) any defective parts.

In the event the Selling Dealer fails to respond to first retail purchaser's notification, or the first retail purchaser is dissatisfied with the Selling Dealer's response, the first retail purchaser shall promptly notify Riviera, in writing at the address shown herein, of the first retail purchaser's dissatisfaction and provide Riviera a reasonable opportunity to cure any defect covered by this Warranty. Any communications in connection with the Warranties, other than communications directly with the Selling Dealer, should be sent to the following address:

      Riviera Australia Pty Ltd.
      Attention: Warranty Department
      50 Waterway Drive
      COOMERA, QLD 4209
      Australia

In the event that the repairs require the transportation of the vessel, such transport shall be at the owner's risk and the owner shall be responsible for any transportation related charges. In no event shall the vessel be returned to the Riviera facilities without the prior written consent of Riviera.

**DESIGN CHANGES**: Riviera reserves the right to modify its vessels through changes in design and material without incurring any responsibility to vessel owners of similar or the same model manufactured at an earlier date.

**CHOICE OF LAWS**: This Warranty and all matters arising related to it shall be interpreted in accordance with the laws of the State of Queensland, Australia. The purchaser and Riviera irrevocably submit to the exclusive jurisdiction of the Queensland courts and courts competent to hear appeals from those courts, and waive any claim or objection based on the absence of jurisdiction or inconvenient forum.

**STATUTE OF LIMITATIONS**: In the event that the right to rescind or revoke acceptance of a purchase exists under the laws of a particular State or Country, arising out of the sale of a vessel manufactured by Riviera, any action seeking rescission or revocation of acceptance of such purchase shall be barred unless commenced within one (1) year after the date of delivery to the first retail purchaser.

**SEVERABILITY**: A clause or part of a clause of this Warranty that is illegal or unenforceable may be severed from this document and the remaining clauses or parts of the clause of this Warranty continue in force. If any provision is or becomes illegal, unenforceable or invalid in any jurisdiction, it is to be treated as being severed from this Warranty in the relevant jurisdiction, but the rest of this Warranty will not be affected.

**WARRANTY REGISTRATION**: Purchasers of new vessels must submit the attached warranty registration card to Riviera within thirty (30) days of purchase to activate the Warranty. A first retail purchaser who fails to do so shall not be entitled to claim under this Warranty.

**NOTICES**: All notices to the first retail purchaser shall be delivered by registered post or by email to the first registered purchaser at the address listed on the warranty registration card or as otherwise notified to Riviera by the first retail purchaser.
All notices to Riviera shall be delivered by registered post on commercial mail to:

      Riviera Australia Pty Ltd.
      Attention: Warranty Department
      50 Waterway Drive
      COOMERA, QLD 4209
      Australia

NOT A CERTIFIED COPY

4

**Riviera Australia Pty Ltd.** WARRANTY REGISTRATION CARD

Hull I.D #_____

Name:_____

Address:_____Phone:_____

City: _____State:_____Post Code:_____

Country: _____

E-Mail Address: _____

Selling Dealer: _____

Purchase Date:_____Delivery Date:_____

CUSTOMER SIGNATURE _____Date_____

**THE PURCHASER ACKNOWLEDGES RECEIVING A COPY OF RIVIERA'S LIMITED WARRANTY AT TIME OF SALE, AND ACCEPTS AND AGREES TO THE LIMITATIONS AND EXCLUSIONS SET OUT IN THIS WARRANTY**

NOT A CERTIFIED COPY

5

**Riviera Australia Pty Ltd.** WARRANTY TRANSFER REGISTRATION CARD

Hull I.D # _____

Name: _____

Address:_____

City: _____State: _____Post Code:_____

Country: _____

E-Mail Address: _____Phone:_____

Selling Dealer: _____

Purchase Date: _____        Delivery Date:_____

Original Handover Date of the Vessel: _____

Hours of the Vessel at Purchase Date:    _____

Warranty to be transferred:        Structural☑    Component*☐    Both*☐

*Please note that the transfer of the component warranty can only be done within the first 24 months of the original handover date. The structural warranty can be transferred within the first seven years of the original handover date.

CUSTOMER SIGNATURE:        _____Date:_____

SELLING DEALER SIGNATURE:_____    Date:_____

THE PURCHASER ACKNOWLEDGES RECEIVING A COPY OF RIVIERA'S LIMITED WARRANTY AT TIME OF SALE, AND ACCEPTS AND AGREES TO THE LIMITATIONS AND EXCLUSIONS SET OUT IN THIS WARRANTY

THIS REGISTRATION CARD MUST BE COMPLETED IN FULL AND SENT TO RIVIERA AUSTRALIA PTY LTD, 50 WATERWAY DRIVE, COOMERA QLD 4209, AUSTRALIA, ALONG WITH THE USD $600 REGISTRATION FEE WITHIN 14 DAYS OF THE DELIVERY TO THE NEW OWNER

NOT A CERTIFIED COPY

**Won Buy Land, LLC vs. Midwest Assets &
Operations, LLC d/b/a OneWater Yacht
Group and Riviera Marine (Int.) Pty. Ltd.,
Inc. d/b/a Yachts of the Americas**

# Composite
# Exhibit C

NOT A CERTIFIED COPY

# GreenspoonMarder LLP

Haas Hatic, Partner
PNC Building
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
Phone: 954.491.1120
Direct Phone: 954.343.6955
Direct Fax: 954.343.6956
Email: haas.hatic@gmlaw.com

*Via Email & U.S. Mail*

August 17, 2022

cmccafferty@riviera.com.au
Chris McCafferty
International Sales Director
Riviera Yachts of the Americas
2801 SE Monroe Street
Stuart, Florida 34997

Chris McCafferty
International Sales Director
Riviera Yachts
5567 SE Avalon Drive
Stuart, FL, 34997-8557

Chris McCafferty
821 NE Third Street
Dania Beach, FL 33004

Re:   (1) **Notice—Revocation of acceptance**—Seller's failure to cure (§672.608(2), Fla. Stat.) Riviera -- 72 SMY 024 "Won Buy Land," HIN # RIY720224H122, and Two Man Engines & Components, Inc. [Port 710 5886 814 5886 and Starboard 710 5886 802 5886] (collectively, the "Riviera Yacht")

(2) **Notice of breach of warranty** Riviera Yacht (§672.607(3)(a), Fla. Stat.)

Dear Mr. McCafferty:

Please take notice that Harry Patten and Won Buy Land, LLC ("Buyer") revoke the previous acceptance of the referenced Riviera Yacht delivered by your Dealer on December 16 and 17, 2021. The Riviera Yacht fails in any respect to conform to the contract, as explained below.

As you know, in early January 2022 only a couple of weeks after delivery, the Yacht Captain discovered a leaking fitting going to the secondary, standby generator, which spilled diesel fuel on the deck. A few days later when the Dealer sent a Technician to the Yacht, the Technician found the port fuel tank emergency shut-off valves completely disconnected. The fuel system problems only got worse.

Atlanta  Boca Raton  Chicago  Denver  Ft. Lauderdale  Las Vegas  Los Angeles  Miami  Naples
Newark  New York  Orlando  Portland  Scottsdale  Tallahassee  Tampa  West Palm Beach

51454220v1 05726.0009

Chris McCafferty
August 17, 2022
Page No. 2

In May 2022, while underway and with the owner and guests aboard, the Yacht's Captain discovered the starboard engine tank and fuel-line leaking. The tank monitoring system revealed that the tank lost 100-120 gallons of diesel fuel. That lost fuel spilled into the vessel causing an environmental incident, which necessitated an emergency pump-out and clean-up of spilled fuel, and another replacement of fuel system fittings.

Despite the repair attempt, the tank and fuel system failed a second and then a third time caused additional environmental contamination. Now the $5MM+ Yacht has been in the Dealer or Manufacturer's hands for nearly four out of eight months of ownership, and the fall-out from the fuel system leaks persists.

The defect substantial impairs the value of the Yacht. A reasonable person would find that fuel system issues causing hundreds of gallons of fuel spilling into the Yacht while underway is a non-conforming and life-threatening defect. Accordingly, Buyer now revokes the previous acceptance of the Riviera Yacht, pursuant to Section 672.601 *et seq.* of the Florida Statutes. *See* Attachment A, "Buyer's Rights on Improper Delivery".

Notice is also given, pursuant to Section 672.607(3)(a) of the Florida Statutes, that the Riviera 72 Sports Motor Yacht referenced above contracted for and delivered on December 16 and 17, 2021, is not of merchantable quality, within the meaning of Section 672.314 of the Florida Statutes, and federal statutory and common law. The Yacht does not meet the standards warranted by you and required by state and federal law, as the above discussion of the fuel-leaks and spills establishes. *See* Attachment A, Section 672.607(3) "Notice of Default" and Section 672.314, Fla. Stat. "Implied Warranty."

As the revocation requires, and since you are in possession off the yacht, please arrange to return the full purchase price of the Yacht paid $5,019,495.00 along with all of Buyer's expenses reasonably incurred, such as incidental and consequential out-of-pocket expenses, presently $ 78,423.68,[1] for a total of $5,097,968.68. Buyer will surrender title to and release its statutory security interest in the Yacht on receipt of full payment. Should you not provide these remedies, Buyer will cover by selling the Yacht in this market. As you can expect, Buyer will necessarily have to disclose these serious deficiencies to any prospective Buyer, and will seek all damages provided by law in an amount no less than that stated above.

---

[1] - camera in galley - $1,072.6; - engine and generator services - $10,970.66; - props, shaft, bottom paint - $16,042.42; - Fighting chair & pedestal $11,127.00; - upgraded charts for electronics $2,636.00; - re-rigged outriggers and hardware $1,100.00; - ceramic coated windows and outriggers - $3,400.00; - monthly divers bottom cleaning $235.00 x 4 months $940.00;insurance $27,675.00; and transportation, crew movements with Yacht related to defect $3,460.00.

Chris McCafferty
August 17, 2022
Page No. 3


Your prompt attention to this matter is expected.

Very truly yours,

GREENSPOON MARDER LLP

Haas Hatic, Partner
Attachment

NOT A CERTIFIED COPY

Chris McCafferty
August 17, 2022
Page No. 4

# ATTACHMENT A

**672.601   Buyer's rights on improper delivery.**—Subject to the provisions of this chapter on breach in installment contracts (s. 672.612) and unless otherwise agreed under the sections on contractual limitations of remedy (ss. 672.718 and 672.719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:

(1)   Reject the whole; or

(2)   Accept the whole; or

(3)   Accept any commercial unit or units and reject the rest.

History.—s. 1, ch. 65-254.

Note.—s. 2-601, U.C.C.

**672.607   Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over.**—

(1)   The buyer must pay at the contract rate for any goods accepted.

(2)   Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this chapter for nonconformity.

(3)   Where a tender has been accepted:

(a)   The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and

(b)   If the claim is one for infringement or the like (s. 672.312(3)) and the buyer is sued as a result of such a breach he or she must so notify the seller within a reasonable time after he or she receives notice of the litigation or be barred from any remedy over for liability established by the litigation.

(4)   The burden is on the buyer to establish any breach with respect to the goods accepted.

(5)   Where the buyer is sued for breach of a warranty or other obligation for which his or her seller is answerable over:

(a)   The buyer may give his or her seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he or she will be bound in any action against him or her by his or her buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend he or she is so bound.

(b)   If the claim is one for infringement or the like (s. 672.312(3)) the original seller may demand in writing that his or her buyer turn over to him or her control of the litigation including settlement or else be barred from any remedy over and if he or she also agrees to bear all expense and to satisfy any adverse judgment, then unless the buyer after seasonable receipt of the demand does turn over control the buyer is so barred.

(6)   The provisions of subsections (3), (4) and (5) apply to any obligation of a buyer to hold the seller harmless against infringement or the like (s. 672.312(3)).

History.—s. 1, ch. 65-254; s. 592, ch. 97-102.

Note.—s. 2-607, U.C.C.

**672.608   Revocation of acceptance in whole or in part.**—

(1)   The buyer may revoke her or his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to her or him if she or he has accepted it:

(a)   On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b)   Without discovery of such nonconformity if her or his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2)   Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3)   A buyer who so revokes has the same rights and duties with regard to the goods involved as if she or he had rejected them.

History.—s. 1, ch. 65-254; s. 593, ch. 97-102.

Note.—s. 2-608, U.C.C.

**672.314   Implied warranty; merchantability; usage of trade.**—

(1)   Unless excluded or modified (s. 672.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with re to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2)   Goods to be merchantable must be at least such as:

(a)   Pass without objection in the trade under the contract description; and

(b)   In the case of fungible goods, are of fair average quality within the description; and

(c)   Are fit for the ordinary purposes for which such goods are used; and

(d)   Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e)   Are adequately contained, packaged, and labeled as the agreement may require; and

(f)   Conform to the promises or affirmations of fact made on the container or label if any.

(3)   Unless excluded or modified (s. 672.316) other implied warranties may arise from course of dealing or usage of trade.

History.—s. 1, ch. 65-254.

Note.—s. 2-314, U.C.C.

| | |
|---|---|
| **From:** | Rene Vazquez <Rene.Vazquez@gmlaw.com> |
| **Sent:** | Wednesday, August 17, 2022 5:51 PM |
| **To:** | cmccafferty@riviera.com.au |
| **Cc:** | Haas Hatic |
| **Subject:** | 72 SMY 024 "Won Buy Land" - Revocation of Acceptance; and Breach of Warranty [IWOV-Active.FID15297757] |
| **Attachments:** | Patten -- Notice of Revocation and Notice Berach Warranty to Chris McCafferty.PDF |

Mr. McCafferty,

Please refer to the attached letter of today's date, from Haas A. Hatic.

Thank you for your attention to this matter.  Please do not hesitate to contact Mr. Hatic should you have any questions or require additional information.



Rene Vazquez
Legal Assistant to Evan B. Klinek, Esq., and Haas A. Hatic, Esq.
**Greenspoon Marder LLP**
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, FL  33301
Main:  (954) 491-1120, Ext. 1942  |  Fax:  (954) 771-9264
rene.vazquez@gmlaw.com  |  www.gmlaw.com



Boca Raton | Denver | Edison | Ft. Lauderdale | Las Vegas | Los Angeles | Miami | Naples
New York | Orlando | Portland | Scottsdale | Tallahassee | Tampa | West Palm Beach

GREENSPOON MARDER LLP LEGAL NOTICE
The information contained in this transmission may be attorney/client privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply e-mail.

Unless specifically indicated otherwise, any discussion of tax issues contained in this e-mail, including any attachments, is not, and is not intended to be, "written advice" as defined in Section 10.37 of Treasury Department Circular 230.

A portion of our practice involves the collection of debt and any information you provide will be used for that purpose if we are attempting to collect a debt from you.



# GreenspoonMarder LLP

Haas Hatic, Partner
PNC Building
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
Phone: 954.491.1120
Direct Phone: 954.343.6955
Direct Fax: 954.343.6956
Email: haas.hatic@gmlaw.com

*Via Email & U.S. Mail*

August 17, 2022

ned@owyg.com
Ned Dozier
OneWater Yacht Group – Dania Beach
821 NE Third Street
Dania Beach, FL 33004

Ned Dozier
OneWater Yacht Group
3225 W. State Road 84
Fort Lauderdale, FL 33312

> Re:  (1) **Notice—Revocation of acceptance**—Seller's failure to cure
> (§672.608(2), Fla. Stat.) Riviera -- 72 SMY 024 "Won Buy Land,"
> HIN # RIY720224H122, and Two Man Engines & Components, Inc.
> [Port 710 5886 814 5886 and Starboard 710 5886 802 5886]
> (collectively, the "Riviera Yacht")
>
> (2) **Notice of breach of warranty** Riviera Yacht
> (§672.607(3)(a), Fla. Stat.)

Dear Mr. Dozier:

Please take notice that Harry Patten and Won Buy Land, LLC ("Buyer") revoke the previous acceptance of the referenced Riviera Yacht delivered by your Dealer on December 16 and 17, 2021. The Riviera Yacht fails in any respect to conform to the contract, as explained below.

As you know, in early January 2022 only a couple of weeks after delivery, the Yacht Captain discovered a leaking fitting going to the secondary, standby generator, which spilled diesel fuel on the deck. A few days later when the Dealer sent a Technician to the Yacht, the Technician found the port fuel tank emergency shut-off valves completely disconnected. The fuel system problems only got worse.

Atlanta  Boca Raton  Chicago  Denver  Ft. Lauderdale  Las Vegas  Los Angeles  Miami  Naples
Newark  New York  Orlando  Portland  Scottsdale  Tallahassee  Tampa  West Palm Beach

51453728v1 05726.0009

Ned Dozier
August 17, 2022
Page No. 2

In May 2022, while underway and with the owner and guests aboard, the Yacht's Captain discovered the starboard engine tank and fuel-line leaking. The tank monitoring system revealed that the tank lost 100-120 gallons of diesel fuel. That lost fuel spilled into the vessel causing an environmental incident, which necessitated an emergency pump-out and clean-up of spilled fuel, and another replacement of fuel system fittings.

Despite the repair attempt, the tank and fuel system failed a second and then a third time caused additional environmental contamination. Now the $5MM+ Yacht has been in the Dealer or Manufacturer's hands for nearly four out of eight months of ownership, and the fall-out from the fuel system leaks persists.

The defect substantial impairs the value of the Yacht. A reasonable person would find that fuel system issues causing hundreds of gallons of fuel spilling into the Yacht while underway is a non-conforming and life-threatening defect. Accordingly, Buyer now revokes the previous acceptance of the Riviera Yacht, pursuant to Section 672.601 *et seq.* of the Florida Statutes. *See* Attachment A, "Buyer's Rights on Improper Delivery".

Notice is also given, pursuant to Section 672.607(3)(a) of the Florida Statutes, that the Riviera 72 Sports Motor Yacht referenced above contracted for and delivered on December 16 and 17, 2021, is not of merchantable quality, within the meaning of Section 672.314 of the Florida Statutes, and federal statutory and common law. The Yacht does not meet the standards warranted by you and required by state and federal law, as the above discussion of the fuel-leaks and spills establishes. *See* Attachment A, Section 672.607(3) "Notice of Default" and Section 672.314, Fla. Stat. "Implied Warranty."

As the revocation requires, and since you are in possession off the yacht, please arrange to return the full purchase price of the Yacht paid $5,019,495.00 along with all of Buyer's expenses reasonably incurred, such as incidental and consequential out-of-pocket expenses, presently $ 78,423.68,[1] for a total of $5,097,968.68. Buyer will surrender title to and release its statutory security interest in the Yacht on receipt of full payment. Should you not provide these remedies, Buyer will cover by selling the Yacht in this market. As you can expect, Buyer will necessarily have to disclose these serious deficiencies to any prospective Buyer, and will seek all damages

---

[1] - camera in galley - $1,072.6; - engine and generator services - $10,970.66; - props, shaft, bottom paint - $16,042.42; - Fighting chair & pedestal $11,127.00; - upgraded charts for electronics $2,636.00; - re-rigged outriggers and hardware $1,100.00; - ceramic coated windows and outriggers - $3,400.00; - monthly divers bottom cleaning $235.00 x 4 months $940.00;insurance $27,675.00; and transportation, crew movements with Yacht related to defect $3,460.00.

Ned Dozier
August 17, 2022
Page No. 3

provided by law in an amount no less than that stated above.

Your prompt attention to this matter is expected.

Very truly yours,

GREENSPOON MARDER LLP

Haas Hatic, Partner
Attachment

51453728v1 05726.0009

Ned Dozier
August 17, 2022
Page No. 4

# ATTACHMENT A

**672.601  Buyer's rights on improper delivery.**—Subject to the provisions of this chapter on breach in installment contracts (s. 672.612) and unless otherwise agreed under the sections on contractual limitations of remedy (ss. 672.718 and 672.719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:

(1)  Reject the whole; or

(2)  Accept the whole; or

(3)  Accept any commercial unit or units and reject the rest.

History.—s. 1, ch. 65-254.

Note.—s. 2-601, U.C.C.

**672.607  Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over.**—

(1)  The buyer must pay at the contract rate for any goods accepted.

(2)  Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this chapter for nonconformity.

(3)  Where a tender has been accepted:

(a)  The buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and

(b)  If the claim is one for infringement or the like (s. 672.312(3)) and the buyer is sued as a result of such a breach he or she must so notify the seller within a reasonable time after he or she receives notice of the litigation or be barred from any remedy over for liability established by the litigation.

(4)  The burden is on the buyer to establish any breach with respect to the goods accepted.

(5)  Where the buyer is sued for breach of a warranty or other obligation for which his or her seller is answerable over:

(a)  The buyer may give his or her seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he or she will be bound in any action against him or her by his or her buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend he or she is so bound.

(b)  If the claim is one for infringement or the like (s. 672.312(3)) the original seller may demand in writing that his or her buyer turn over to him or her control of the litigation including settlement or else be barred from any remedy over and if he or she also agrees to bear all expense and to satisfy any adverse judgment, then unless the buyer after seasonable receipt of the demand does turn over control the buyer is so barred.

(6)  The provisions of subsections (3), (4) and (5) apply to any obligation of a buyer to hold the seller harmless against infringement or the like (s. 672.312(3)).

History.—s. 1, ch. 65-254; s. 592, ch. 97-102.

Note.—s. 2-607, U.C.C.

**672.608  Revocation of acceptance in whole or in part.**—

(1)  The buyer may revoke his or her acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to her or him if she or he has accepted it:

(a)  On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b)  Without discovery of such nonconformity if her or his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2)  Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3)  A buyer who so revokes has the same rights and duties with regard to the goods involved as if she or he had rejected them.

History.—s. 1, ch. 65-254; s. 593, ch. 97-102.

Note.—s. 2-608, U.C.C.

**672.314  Implied warranty; merchantability; usage of trade.**—

(1)  Unless excluded or modified (s. 672.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with re to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2)  Goods to be merchantable must be at least such as:

(a)  Pass without objection in the trade under the contract description; and

(b)  In the case of fungible goods, are of fair average quality within the description; and

(c)  Are fit for the ordinary purposes for which such goods are used; and

(d)  Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e)  Are adequately contained, packaged, and labeled as the agreement may require; and

(f)  Conform to the promises or affirmations of fact made on the container or label if any.

(3)  Unless excluded or modified (s. 672.316) other implied warranties may arise from course of dealing or usage of trade.

History.—s. 1, ch. 65-254.

Note.—s. 2-314, U.C.C.

| | |
|---|---|
| **From:** | Rene Vazquez <Rene.Vazquez@gmlaw.com> |
| **Sent:** | Wednesday, August 17, 2022 5:48 PM |
| **To:** | ned@owyg.com |
| **Cc:** | Haas Hatic |
| **Subject:** | 72 SMY 024 "Won Buy Land" - Revocation of Acceptance; and Breach of Warranty [IWOV-Active.FID15297757] |
| **Attachments:** | Patten -- Notice of Revocation and Notice Berach Warranty to Ned Dozier.PDF |

Mr. Dozier,

Please refer to the attached letter of today's date, from Haas A. Hatic.

Thank you for your attention to this matter.  Please do not hesitate to contact Mr. Hatic should you have any questions or require additional information.



Rene Vazquez
Legal Assistant to Evan B. Klinek, Esq., and Haas A. Hatic, Esq.
**Greenspoon Marder LLP**
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, FL  33301
Main:  (954) 491-1120, Ext. 1942  |  Fax:  (954) 771-9264
rene.vazquez@gmlaw.com  |  www.gmlaw.com



Boca Raton | Denver | Edison | Ft. Lauderdale | Las Vegas | Los Angeles | Miami | Naples
New York | Orlando | Portland | Scottsdale | Tallahassee | Tampa | West Palm Beach

GREENSPOON MARDER LLP LEGAL NOTICE

The information contained in this transmission may be attorney/client privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply e-mail.

Unless specifically indicated otherwise, any discussion of tax issues contained in this e-mail, including any attachments, is not, and is not intended to be, "written advice" as defined in Section 10.37 of Treasury Department Circular 230.

A portion of our practice involves the collection of debt and any information you provide will be used for that purpose if we are attempting to collect a debt from you.



**EXHIBIT B**

## IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, INAND FOR PALM BEACH COUNTY, FLORIDA

**WON BUY LAND, LLC,**

      **Plaintiff,**

**vs.**                                 **CASE NO.:  2022 CA 8601**

**MIDWEST ASSETS AND OPERATIONS, LLC**
**A Georgia Limited Liability Company,**
**d/b/a ONE WATER YACHT GROUP**

**and**

**RIVIERA MARINE, (INT.) PTY. LTD., INC.,**
**An Australian Corporation,**
**d/b/a YACHTS OF AMERICAS,**

      **Defendants.**

_____/

## DEFENDANT, RIVIERA MARINE, (INT.) PTY. LTD., INC.'S NOTICE OF FILING NOTICE OF REMOVAL

      NOTICE IS HEREBY GIVEN, pursuant to 28 U.S.C. §1446, that Defendant, RIVIERA

MARINE, (INT.) PTY. LTD., INC., has filed a Notice of Removal of this action to the United

States District Court for the Southern District of Florida, West Palm Beach Division. A copy of

the Notice of Removal is attached hereto as Exhibit A and incorporated as if fully set forth herein.


      Respectfully Submitted on this 30th day of September, 2022.


                          **BERLIN | PATTEN | EBLING, PLLC**
                          3700 South Tamiami Trail, Suite 200
                          Sarasota, Florida 34239
                          Telephone: (941) 954-9991; Facsimile: (941) 954-9992
                          Primary E-Mail:  dguarnieri@berlinpatten.com
                          Secondary E-mail:  marinal@berlinpatten.com

                          By: s/*Daniel C. Guarnieri*
                          Daniel C. Guarnieri, Esq.
                          Florida Bar No. 0914401

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on this 3rd day of October, 2022, I electronically filed the foregoing document with the United States District Court for the Middle District of Florida by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: s/*Daniel C. Guarnieri*
Daniel C. Guarnieri, Esq.
Florida Bar No. 0914401

<u>Service List:</u>
Haas Hatic
Greenspoon Marder LLP
200 East Broward Blvd. Ste. 1800
Ft. Lauderdale, FL 33301
Email: haas.hatic@gmlaw.com